# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-24-00599-CV

A. P., Appellant

v.

Texas Department of Family and Protective Services, Appellee

FROM THE 425TH JUDICIAL DISTRICT COURT OF WILLIAMSON COUNTY
NO. 23-0027-CPS425, THE HONORABLE BETSY F. LAMBETH, JUDGE PRESIDING

## MEMORANDUM OPINION

A.P. ("Mother") appeals from the trial court's decree terminating her rights to her son J.P. following a bench trial.[1]  The trial court found that termination of Mother's parental rights was in J.P.'s best interest and that Mother knowingly placed or knowingly allowed J.P. to remain in conditions or surroundings that endangered his physical or emotional well-being, engaged in conduct or knowingly placed him with persons who engaged in conduct that endangered his physical or emotional well-being, failed to comply with the provisions of a court order that established the actions necessary to obtain his return, and had a mental or emotional illness that rendered her unable to provide for his needs.  *See* Tex. Fam. Code §§ 161.001(b)(1)(D), (E), (O), (b)(2), .003(a).  On appeal, Mother challenges the factual

---

[1] To protect the child's privacy, we will refer to him by a pseudonym and to family members by their relationships to him.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

sufficiency of the evidence supporting the trial court's best-interest determination. We will affirm the trial court's termination decree.

## BACKGROUND

In February 2023, Mother's boyfriend ("Boyfriend") called the police to report that he was worried Mother might hurt herself or become violent due to behavior that she exhibited when he was trying to end their relationship. When the police arrived, Mother told the police that she just had a miscarriage, bitten through the umbilical cord, and placed the fetus in a trashcan in the apartment that she shared with Boyfriend and her then three-year-old son J.P. During a search of the apartment, the police did not find a fetus or anything indicating that Mother had a miscarriage. Mother also incorrectly claimed that she was a police officer. The police found unsecured and loaded guns in the apartment that could have been accessed by J.P. Due to her erratic behavior, the police transported Mother to a mental-health hospital. Mother admitted that she could not care for J.P. at that time, and testing performed at the hospital confirmed that Mother had not been pregnant recently.

The police contacted the Department of Family and Protective Services ("Department") to make living arrangements for J.P. The Department initially placed J.P. with a family member before placing him in a foster home, and the Department filed its petition for protection of a child, for conservatorship, and for termination of parental rights on February 28, 2023. The Department was named temporary managing conservator in March 2023, and the Department also created a family service plan for Mother that was later incorporated into an order of the trial court. The service plan emphasized that the Department's chief concern was Mother's mental health and ability to care for J.P. and herself. Under the service plan, Mother

2

was required to (1) maintain a safe and stable home free of drugs and violence, (2) refrain from engaging in any criminal activity, (3) participate in all court-ordered services, (4) stay in contact with the Department and notify it of any change in her address or employment, (5) maintain legal employment and demonstrate that she could meet J.P.'s and her basic needs, (6) complete a drug and alcohol assessment and follow all recommendations, (7) submit to random drug tests at the request of the Department, (8) attend individual therapy to address her mental-health issues, (9) submit to a psychological evaluation and follow all recommendations, (10) submit to a psychiatric evaluation and follow all recommendations, and (11) complete a protective parenting class to address concerns stemming from her admission that she allowed J.P. to play with a loaded gun. The psychiatrist who evaluated Mother recommended that Mother attend a domestic violence class because Mother claimed that she had been the victim of domestic violence.

In December 2023, Mother was admitted to another mental-health hospital after having another crisis. After being released, Mother went back to the apartment that she shared with Boyfriend, but she quickly moved to a domestic-violence shelter after Boyfriend assaulted her. Mother later left the shelter and moved to a few different homes before ultimately moving back into the same apartment that she shared with Boyfriend. Mother continued to reside there through the end of the trial in this case.

At trial, the Department called the following witnesses: a Department caseworker, a Department investigator, a Court Appointed Special Advocate ("CASA") volunteer, a conservatorship specialist who handled the case while the caseworker was briefly unavailable, Foster Mother, Foster Father, and Mother. The caseworker explained that the Department became involved in the case when Mother became suicidal and started experiencing delusions that she had a miscarriage and that she was a police officer. Further, the caseworker related that

3

Mother was admitted into the mental-health hospital due to her delusions and that Mother admitted that she was not fit to raise J.P. at the time. Moreover, the caseworker recalled that Mother was ultimately diagnosed with "Bipolar I with a recent manic history of psychotic features, moderate to severe generalized anxiety disorder with panic attacks, and a moderate to severe chronic post-traumatic stress disorder"; that Mother admitted during her evaluation that she had used illegal drugs in the past, including opiates and methamphetamine; and that J.P.'s father had died from a drug overdose. Additionally, the caseworker mentioned that the Department had reason to believe that Mother had neglected J.P. In particular, the caseworker stated that J.P. became overly attached to the caseworker and would cry "hysterically" when she left him.

The caseworker testified that in a visit to Mother's home after her release from the hospital the first time, there were unsecured guns and ammunition throughout the apartment like there had been when the police responded to the 911 call by Boyfriend. Further, the caseworker described Mother's mental health at that time as poor, and she stated that Mother's having access to weapons in that condition presented a dangerous situation. Similarly, the caseworker related that having unsecured and loaded weapons in the apartment was dangerous "with a child around." When the caseworker discussed the weapons with Mother, Mother mentioned thinking of shooting someone she thought might have been following her and said that Boyfriend was not willing to lock up the weapons.

Next, the caseworker testified regarding Mother's service plan and explained that she went over the plan with Mother. Further, the caseworker related that Mother never tested positive for drugs and completed many of the services, including completing a psychological and psychiatric evaluation, submitting to all required drug tests, completing a nurturing parenting

4

course, staying in contact with the Department, maintaining employment at the time of her hearing after having stopped working for a while, completing individual therapy, and submitting to an alcohol and drug assessment.

However, the caseworker explained that Mother did not address the Department's primary concern regarding her unstable mental health. Although the caseworker mentioned that Mother took mental-health medications and became more stable after being released from the hospital following the 911 call, the caseworker also stated that Mother did not comply with the recommendation that she take mental-health medication because she stopped taking it at various points throughout the case for months at a time and had not been taking her medication during the eight or nine months before the trial. The caseworker related that Mother claimed she stopped taking her medicine because her insurance lapsed, but the caseworker also testified that she provided Mother with information about how to obtain the medicine through county health services. Additionally, the caseworker mentioned that she could tell when Mother was off her medications because Mother would act strangely and experience delusions. She also expressed concern that Mother's violent delusions could pose a threat to J.P. Concerning one delusion, the caseworker described how Mother claimed to have seen two individuals shoot each other on a bus, but the caseworker explained that she confirmed that there was no shooting. Further, the caseworker discussed how Mother had to be admitted into a mental-health hospital in December 2023 during the pendency of this case. The caseworker testified that Mother did not have a support system to help with her issues.

Regarding Mother's relationship with Boyfriend, the caseworker described how Mother had to move out of their apartment and into a domestic-violence shelter after Boyfriend assaulted her. Further, the caseworker related that Mother mentioned that Boyfriend called and

5

threatened her while she was at the shelter. Although the caseworker testified that Mother did not live with Boyfriend immediately after leaving the shelter, she explained that Mother moved back into the apartment before the trial and that the CASA in this case recently heard Mother and Boyfriend arguing at the apartment. The caseworker recalled that Mother's psychiatrist recommended that Mother take a domestic violence class because the class would be helpful given Mother's living arrangements, but that Mother had not taken the class; however, the caseworker acknowledged that the recommendation had been made recently. Additionally, the caseworker related that Mother's decision to place herself in a situation involving domestic violence could pose a threat to J.P. and could result in his injury if there were more incidents.

When discussing Mother's visits with J.P., the caseworker explained that the visits went well, that Mother acted appropriately towards J.P., that they were bonded, that they loved one another, and that he was happy to see her at the visits. Although the caseworker acknowledged that J.P. had expressed a desire to leave with Mother, the caseworker related that J.P. was happy to see Foster Parents after the visits. The caseworker also stated that Mother had never physically harmed J.P. Further, the caseworker believed that Mother could be protective of J.P. if she could get her delusions under control; she acknowledged that Mother willingly checked herself into a mental-health hospital to address her issues.

The caseworker explained that it was in J.P.'s best interest for him to have some type of contact with Mother, acknowledged that his interests might be protected through a custody arrangement, and noted that this was a hard case because it involved mental-health issues; however, the caseworker testified that terminating Mother's parental rights was in J.P.'s best interest and would provide the permanency that the Department wanted for J.P. Further, the caseworker detailed how the Department had recently made the difficult decision to recommend

termination in this case because of Mother's failure to stabilize her mental health through consistent medication and because Mother was living with Boyfriend again.

In similar testimony, the Department investigator explained that Mother was having delusions about being pregnant and having a miscarriage, that there were unsecured and loaded guns on a table and throughout Mother's apartment that J.P. could have picked up and hurt someone with, and that J.P. did not have any injuries when the case started. Additionally, the investigator related that Mother initially stated that her family had forced her to take custody of J.P. before she was hospitalized even though her family knew that she could not care for him. Further, the investigator recalled that Mother wanted J.P. to be placed into the foster-care system. Moreover, the investigator discussed additional delusions that Mother experienced during the case, including believing that J.P. would be the savior of the world and had the power to heal and stating that she had once driven off a cliff while pregnant, resulting in her being paralyzed for years.

The CASA in this case also testified regarding Mother's delusions about being pregnant and a police officer and regarding the presence of multiple unsecured and loaded weapons in Mother's apartment. Further, the CASA stated that Mother admitted that she used "a lot of drugs as a teenager and young adult" and had "mental health issues her entire life, that she had been on and off medication but that she had been off medication for several years" before being hospitalized at the time of the removal, and that she "had good times and bad times" when off her medication. The CASA related that Mother stated at the beginning of the case that she no longer used drugs, that she could not care for J.P., and that she wanted someone else to raise him.

Like the caseworker, the CASA mentioned that although Mother claimed that she would continue therapy and stay on her medication, she stopped seeing her therapist for several

7

months, stopped taking her medicine throughout the case, and was not on it at the time of the trial. More specifically, the CASA stated that Mother stopped taking her medicine seven times during the case, had been on it for less than half the time since J.P. had been removed, and had been off it for "a long period of time" before the trial. The CASA thought that it was not a viable option for Mother to be off her medication for extended periods of time. Moreover, the CASA testified that she told Mother that there were county services available to her to obtain both therapy and medication and that Mother was not taking her medication due to her own actions and due to her lack of a support network.

Additionally, the CASA related that Mother had mental-health crises and delusions during the pendency of this case, including inventing family members that did not exist and missing a visit because "she was in an army base" and believed she "was on a SWAT team and was armed." The CASA was unable to determine whether Mother was in fact carrying a firearm while under the delusion of being on a SWAT team. The CASA explained that Mother's mental-health issues caused her to behave in ways that could endanger J.P., particularly if she had access to weapons while under a delusion about law-enforcement activity. Moreover, the CASA recalled seeing injuries on Mother during a later visit and stated that Mother admitted that Boyfriend "had abused and beaten her." The CASA related that Mother moved back in with Boyfriend following the assault and was living with him shortly before the trial but that Mother claimed Boyfriend was now just a roommate.

In addition, the CASA revealed that Mother wanted to have a joint parenting arrangement with Foster Parents in which J.P. would alternate living with Foster Parents and her. Further, the CASA testified that Mother said she understood that any guns and alcohol in her home would need to be secured. However, the CASA also related that Mother told her at the

8

beginning of the case and more recently in December 2023 that she could not care for J.P. and that someone else should raise him. Although the CASA acknowledged that she did not have concerns about Mother having harmed J.P. physically, that Mother acted appropriately with J.P. during their visits, and that the pair were bonded and loved one another, the CASA explained that Mother was not "currently able to provide a safe, stable environment" for J.P., that she was in the same problematic housing situation that she was in at the start of the case, and that there were "still guns and liquor out and available" in the apartment. Regarding the weapons in the apartment, the CASA revealed that Mother admitted that there were a lot of weapons in the house, that it was not safe to have the weapons unsecured in the home, and that Boyfriend continued to acquire more weapons during the pendency of this case.

Concerning J.P., the CASA testified that at the start of the case J.P. would overly attach to any adult to whom he was introduced and that his readiness to attach to an unhealthy level indicated that he had already suffered from the consequences of Mother's untreated mental illness. Further, the CASA explained that since living with Foster Parents, J.P.'s attachment issue had improved, and that J.P. referred to Foster Parents as "Mommy and Daddy." The CASA related that J.P. was doing very well in the custody of Foster Parents.

Although the CASA suggested that it was in J.P.'s interest to continue having a relationship with Mother, the CASA ultimately concluded that it was in J.P.'s best interest to have Mother's parental rights terminated even if that might result in Mother's not being allowed to see J.P. and that any benefit from maintaining a relationship with Mother was less important than J.P.'s need for permanency. The CASA recommended that Foster Parents be allowed to adopt J.P. and discussed how termination of Mother's rights would allow Foster Parents to adopt J.P. and make short-term and long-term plans for him. Relatedly, the CASA testified that

9

awarding Mother custody or visitation would not provide J.P. with permanency because Mother could elect not to visit him and because it would impact the ability of Foster Parents to make family plans, including ones about where they wanted to live.

The conservatorship specialist who temporarily took over the caseworker's responsibilities in this case testified that when he went to Mother's apartment for a home visit, Boyfriend became volatile, started screaming, and cursed at him. Further, the specialist related that after that experience and after learning that there were weapons in the house, he became concerned about the potential for domestic violence in the house and about other safety concerns rendering the home an unsafe place for J.P. Additionally, the specialist recalled that Mother informed him before she went to a domestic-violence shelter that Boyfriend had assaulted her before and broken her ribs. The specialist discussed Mother's admission that her anxiety and depression would cause her to stay in her room for days; she explained that this type of behavior would interfere with Mother's ability to parent J.P. if Mother did not get her mental health under control. Although the specialist agreed that Mother and J.P. loved one another and were bonded, that their visits went well, and that it would be in his best interest to have continued contact with her either through a custody agreement or another type of arrangement, the specialist explained that it was in his best interest to terminate her rights because he was in a stable home now, because he had a good relationship with Foster Parents, and because Foster Parents met all of his needs.

Foster Mother testified that Foster Father and she were licensed to be foster parents and that J.P. had lived with them for approximately one year. Further, Foster Mother explained that Foster Father and she had full time jobs and that she was able to work from home. Foster Mother also related that Foster Father and she wanted to adopt J.P. and that they loved

him. Moreover, Foster Mother expressed that Foster Father and she would still like to care for J.P. even if Mother's rights were not terminated and that they could work out a visitation schedule if necessary.

When discussing Mother, Foster Mother related that Mother and J.P. enjoyed their visits together and were bonded. Foster Mother described having a friendly relationship with Mother, stated that she kept Mother updated about events in J.P.'s life, did not recall receiving any concerning messages from Mother, and testified that she had been able to maintain a boundary with Mother. Foster Mother also mentioned that she would like for Mother to have a relationship with J.P., including visits, because she believed it was in J.P.'s best interest to have a relationship with Mother. Additionally, Foster Mother believed that Mother would not intentionally endanger J.P. and would try do what was best for him. However, Foster Mother expressed that Mother needed more stability in her life and needed to become stabilized on her mental-health medications.

Regarding J.P., Foster Mother testified that his speech was delayed when he was first placed with Foster Father and her, but she explained that they enrolled J.P. in speech therapy and that he was making great progress. Foster Mother recalled that J.P. had no other issues when he was first placed in her home and that he seemed to have been taken care of physically. Next, Foster Mother explained that J.P. was happy in her home, was thriving, had friends, was doing well in preschool, and had relationships with Foster Father's and her extended families. Additionally, Foster Mother related that their plan was to enroll J.P. in kindergarten and had already applied to a school near their house. Foster Mother mentioned having concerns about J.P.'s safety and about Mother's having weapons in her home. Foster Mother could not recall J.P.'s having expressed a desire to live with Mother and explained that his foster home was more

11

stable for J.P. because he had a community and friends where he lived, because Foster Father and she had flexible work schedules and could take care of J.P., and because they had the financial resources to care for J.P. Finally, Foster Mother testified that she believed that terminating Mother's parental rights was in J.P.'s best interest.

Foster Father also related that J.P. had difficulty speaking when he was placed in foster care, that J.P. was otherwise physically healthy, that J.P.'s speech had progressed significantly while in foster care, that Foster Father and Foster Mother wanted to adopt J.P., and that J.P. had already formed relationships with their extended families. Further, Foster Father testified that J.P. had become more social and less shy while living with Foster Parents. Although Foster Father said that J.P. was happy to see Mother for their visits, that J.P. should have a relationship with Mother because it was in his best interest, and that Foster Father and Foster Mother would still want J.P. placed with them if Mother's rights were not terminated, he also explained that he did not want to be involved in a conservatorship with Mother. Finally, Foster Father believed that J.P. would have more permanency and stability living in their home and that it was in J.P.'s best interest to have Mother's parental rights terminated.

On the last day of trial, Mother testified that she was removed from her mother's custody when she was two years old after her mother tried to sell her and her siblings for drugs and that she went into the foster-care system before ultimately being placed with her great aunt. Further, Mother recalled being diagnosed with bipolar disorder and placed on medication when she was five or six years old while living with her great aunt. When discussing her mental-health history, Mother described having been hospitalized before J.P. was born because she tried to commit suicide. Mother agreed that she suffers from anxiety and depression but disagreed with

12

the diagnosis that she had bipolar disorder. Additionally, Mother mentioned that J.P.'s father died of a drug overdose.

In her testimony, Mother acknowledged that this case started due to concerns about her mental health and admitted that at the time of J.P.'s removal, she was not taking any medication because she believed that she had not been prescribed the appropriate dosage. Although Mother agreed that her being on mental-health medications helped her and asserted that she tried to consistently take medication, she admitted that she was not taking any medicine at the time of trial and that she had lapses in taking her medication at various times because she would forget to take her medication or did not see the point. However, she also explained that she stopped taking her medication because she lost her health insurance and that she had recently seen a doctor to inquire about going back on it. Instead of taking medicine, Mother stated that she meditated to help with her mental health and would admit herself into a mental-health hospital if she needed additional help as she had done in the past. Along those lines, Mother claimed that if she started to experience a mental-health crisis, she would place J.P. in the custody of someone in her support system.

Concerning Boyfriend, Mother said that he had guns throughout the apartment and that she bought Boyfriend guns as gifts but kept them in her name. Mother admitted that she was in an abusive relationship with Boyfriend and that he "would beat [her], pull a gun on [her], just throw things at [her], [and] cut [her] sometimes." In fact, Mother described how Boyfriend had aimed a gun at her and threatened her on two different occasions, but she emphasized that he did not hurt anyone else while hurting her. Although Mother admitted that she was living in the same apartment that she had previously shared with Boyfriend, she claimed that he had been arrested and that Boyfriend's cousin was now her roommate instead of Boyfriend. Mother

13

related that she did not ever want to see Boyfriend again, that she did not know how long Boyfriend would be in jail or why he had been arrested, and that she would move out of state and closer to her family if Boyfriend were released.

Mother stated that at the time of trial she had three jobs in the security field, that she wanted to continue working in that industry, and that she wanted to get promoted to the level where she could carry a gun while working. Additionally, Mother emphasized that she had successfully completed individual therapy, submitted to a psychological and a psychiatric assessment, completed a nurturing parenting program, submitted to all required drug tests, and communicated with the Department during the case. Mother explained that she did not recall being asked to attend a domestic-violence class but asserted that she would have attended one if she had been asked to do so. Further, Mother testified that she was saving money to get her own apartment and had a support network of family and friends. Although Mother admitted that there were still weapons in the apartment, she asserted that they were locked in another room that J.P. would not have access to. Mother believed that she could now care for J.P. because she was no longer involved with Boyfriend.

Regarding J.P., Mother agreed that she initially wanted J.P. in foster care to keep him safe but noted that J.P. and she were bonded, that she never physically harmed him, and that she wanted to continue visiting with him. Moreover, Mother stated that she wanted her rights to J.P. to be legally protected and that she would comply with any visitation order. Mother promised to contribute financially to the costs associated with raising J.P. Next, Mother related that if she were awarded custody of J.P., she would enroll him in school, buy him clothes and food that were appropriate for his age, and encourage him to participate in a sport of his

14

choosing. Finally, Mother testified that it was in J.P.'s best interest to have contact with her and for her parental rights to remain intact.

After considering the evidence, the trial court determined that termination of Mother's parental rights was in J.P.'s best interest and that she had knowingly placed or allowed him to remain in conditions or surroundings that endangered his physical or emotional well-being, engaged in conduct or knowingly placed him with persons who engaged in conduct that endangered his physical or emotional well-being, and failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain custody of him. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). Further, the trial court determined that Mother had a mental illness that rendered her unable to provide for J.P.'s physical, emotional, and mental needs and would continue to render her unable to provide for his needs until he was eighteen years old. *See id.* § 161.003.

When explaining its ruling, the trial court stated that the case was a difficult one because Mother and J.P. loved one another. However, the trial court explained that the evidence demonstrated a link between Mother's mental health and her inability to care for J.P., including evidence of many loaded guns in the apartment, her delusions creating detachments from reality, her admission that she could not care for J.P., her prior suicide attempt, domestic violence by Boyfriend, and her decision to move back into the home with Boyfriend following the abuse. Further, the trial court highlighted that Mother did not testify that she currently could care for J.P. and that there was nothing to support her testimony that she was not living with Boyfriend or that he was in jail. Although the trial court acknowledged that Mother had completed many of the services required of her, it also related that she had not demonstrated an ability to manage her mental health and that it did not find credible her testimony stating that she was not on

15

medication because her insurance lapsed. Moreover, the trial court stated that it considered appointing Mother as a possessory conservator but ultimately determined that it did not want to tie the hands of an adoptive family in that manner or interfere with the adoptive family's ability to make decisions that were in J.P.'s best interest.

Mother appeals the trial court's decree terminating her parental rights.

## STANDARD OF REVIEW AND GOVERNING LAW

To terminate an individual's parental rights, the Department must prove by clear and convincing evidence that the parent engaged in conduct constituting at least one statutory ground for termination in the Family Code and that termination is in the child's best interest. *Id.* § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. "While parental rights are of constitutional magnitude, they are not absolute." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Accordingly, "[a]n appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt," and the "emotional and physical interests of the child" should "not be sacrificed merely to preserve that right." *Id.*

On appeal, Mother limits her appellate challenge to the factual sufficiency of the evidence supporting the trial court's best-interest determination. Assessing "[f]actual sufficiency . . . requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder

16

could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We are also mindful that we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of the witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003) (warning that "appellate factfinding is particularly dangerous" in termination cases "where so much turns on the witnesses' credibility and state of mind").

The determination regarding whether termination is in a child's best interest "is child centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631. It is guided by multiple non-exclusive factors, including the following: (1) the child's wishes, (2) the child's physical and emotional needs, (3) the physical and emotional danger to the child now and in the future, (4) the parental abilities of the people seeking custody, (5) programs available to help those people, (6) the plans for the child by those people or the agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions indicating that the parent-child relationship is improper, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The Department need not prove all the factors, and the absence of evidence for some of the factors does not preclude a finding that termination is in the child's best interest. *Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.). "While no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the child's best

17

interest." *Id.* Evidence pertaining to a statutory ground for termination may also be probative of the best-interest determination, *In re C.H.*, 89 S.W.3d at 28, particularly evidence pertaining to endangerment, *M.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00541-CV, 2023 WL 2025710, at *5 (Tex. App.—Austin Feb. 16, 2023, no pet.) (mem. op.). A parent's past conduct may be used to "measure a parent's future conduct" when determining "whether termination of parental rights is in the child's best interest." *See In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). The best-interest component emphasizes the best interest of the child and not that of the parent. *In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.).

## DISCUSSION

In one issue on appeal, Mother contends that the evidence was factually insufficient to support the trial court's best-interest finding. As support, Mother highlights that no evidence was introduced establishing that J.P. suffered any physical harm due to her acts or omissions and that she never failed a drug test. Further, Mother emphasizes the testimony from the Foster Parents, caseworker, and CASA stating that Mother and J.P.'s visits went well, that they enjoyed each other's company, that they loved each other, that they should continue to have a relationship, that he did not have any medical issues when he was placed in foster care, that she would not intentionally endanger him and had not harmed him, and that she would try to do what was best for him. Although Mother acknowledges that the evidence pertaining to her mental health "raises legitimate concerns," she asserts that these concerns and her lack of stable housing are "less relevant" in this case because she is challenging only the termination of her parental rights and is not challenging the Department's appointment as managing conservator. For these

18

reasons, Mother argues that the evidence was factually insufficient to support the trial court's determination that termination of her parental rights was in J.P.'s best interest.

We begin by noting that because Mother has not challenged the predicate endangerment, failure-to-comply, and mental-illness findings against her, *see* Tex. Fam. Code §§ 161.001(b)(1)(D), (E), (O), .003(a), those findings are binding in this appeal and may support the best-interest finding, *A.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00054-CV, 2023 WL 4424848, at *3 (Tex. App.—Austin July 11, 2023, no pet.) (mem. op.); *see In re C.H.*, 89 S.W.3d at 28; *In re A.K.*, 487 S.W.3d 679, 688 (Tex. App.—San Antonio 2016, no pet.); *see also In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *8 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) ("The failure to comply with a service plan can support the trial court's best interest finding").

Turning to the *Holley* factors and concerning the physical and emotional danger to J.P. now and in the future, evidence was presented at trial demonstrating that Mother had suffered with mental-health issues for nearly her entire life and that she had been diagnosed with several mental illnesses, including bipolar disorder with mania and psychosis, anxiety, depression, and chronic post-traumatic stress disorder. Further, the evidence established that Mother had been hospitalized multiple times due to her mental-health issues, including once when she attempted suicide and once when she was suffering from delusions. The Department explained that the need to have Mother stabilize her mental health was one of the key issues in the case.

Additionally, evidence was presented showing that Mother was not taking her mental-health medication at the time of trial, had not been taking it for months, and had been on it less than half the time since J.P.'s removal in early 2023. *See In re S.R.*, 452 S.W.3d 351, 363

19

(Tex. App.—Houston [14th Dist.] 2014, pet. denied) (explaining that although mental illness alone is not ground for terminating parental rights, "[u]ntreated mental illness can expose a child to endangerment . . . and is a factor the court may consider"); *In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied) (reasoning that parent's failure to "take steps to treat her mental health issues demonstrated an inability to provide" her child "with a safe environment"). Although Mother testified that she had been attempting to go back on her medication and that she stopped taking it because her insurance lapsed, the trial court did not find that testimony credible. *See In re A.B.*, 437 S.W.3d at 503. In making that credibility determination, the trial court was aided by the testimony of other witnesses describing the efforts undertaken to help Mother go back on her medicine even without insurance and by Mother's admission that she had in the past stopped taking it because she did not see the point. *See In re A.C.*, 559 S.W.3d 176, 180 (Tex. App.—Dallas 2017) (noting that appellate courts must defer to factfinder's credibility determination in factual-sufficiency review), *aff'd*, 560 S.W.3d 624 (Tex. 2018).

Further, uncontradicted evidence was presented showing that while off of her medication, Mother experienced delusions that involved violence and that could have posed a danger to J.P., including believing that she had been pregnant and discarded a fetus after biting through the umbilical cord, discussing the potential need to shoot someone whom she believed had been following her, describing seeing two individuals shooting one another, remembering an incident in which she believed that she drove off a cliff while pregnant and became paralyzed for years, and thinking that she was an armed member of a SWAT team. *See In re K.A.S.*, 131 S.W.3d 215, 223 (Tex. App.—Fort Worth 2004, pet. denied) (mentioning mother's bipolar disorder, delusional thoughts, and hospitalization when concluding that she had endangered

children). Additionally, evidence was presented indicating that Mother's mental-health issues had affected J.P.'s mental well-being. Specifically, the CASA testified that J.P.'s attachment issues stemmed from Mother's untreated mental-health issues. Further, multiple witnesses testified that Mother admitted to being unable to care for J.P. at various times throughout the case including in February and December of 2023. *See In re L.M.*, No. 06-18-00063-CV, 2018 WL 6033691, at *3 (Tex. App.—Texarkana Nov. 19, 2018, no pet.) (mem. op.) (highlighting in best interest analysis that mother admitted that she could not care for children due to her mental illness). Based on the preceding, the trial court could have reasonably concluded that Mother's unstable mental health could endanger J.P. physically and emotionally even if the Department remained as managing conservator. *See In re B.L.M.*, 114 S.W.3d 641, 646, 648 (Tex. App.—Fort Worth 2003, no pet.) (explaining that evidence concerning parent's mental health and delusions could have allowed factfinder to reasonably conclude that parent could not provide for child's needs and that it was not necessary for witness to testify "*with certainty*" that parent's mental illness would prevent him from caring for child).

In addition to evidence concerning Mother's mental health, evidence was presented regarding how there were at the time of removal unsecured and loaded weapons that J.P. could have reached. *Cf. In re J.J.R.S.*, 607 S.W.3d 400, 403, 405 (Tex. App.—San Antonio 2020) (considering in conservatorship context that children had access to mother's unsecured gun), *aff'd*, 627 S.W.3d 211 (Tex. 2021). Further, the family service plan documented that Mother was required to attend a protective parenting class after having allowed J.P. to play with a loaded gun. *Cf. In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *11 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.) (including in endangerment analysis that baby was given access to loaded gun). The testimony at trial showed that Boyfriend continued to

acquire additional weapons throughout the case and refused to secure the weapons even though the Department had expressed its concern to Mother about the presence of unsecured weapons in the home, and Mother admitted that she gave guns to Boyfriend. Although Mother testified that the weapons were now being stored in a room that J.P. would not be able to access, the CASA stated that there were still accessible guns in the apartment.

Moreover, witnesses testified how Mother had to move out of her home and into a domestic-violence shelter after Boyfriend assaulted her following the removal of J.P. and then moved back into the apartment with Boyfriend. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (explaining that domestic violence can be considered as evidence of endangerment); *see also In re M.R.*, 243 S.W.3d 807, 818-19 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of children's exposure to domestic violence supported endangerment finding). In addition, the conservatorship specialist testified that Mother informed him that Boyfriend had previously physically assaulted her and broken her ribs. Mother testified that Boyfriend threatened her while aiming a gun at her on two occasions and also cut and beat her. Although Mother related that Boyfriend was no longer living at the apartment because he was in jail, the trial court noted that there was nothing that corroborated that testimony. On the contrary, evidence was presented that the CASA had recently overheard an argument between Mother and Boyfriend at the apartment.

Concerning J.P.'s wishes, although J.P. was too young to testify regarding his desires concerning placement, *see In re D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *7 (Tex. App.—San Antonio Mar. 4, 2020, no pet.) (mem. op.) (explaining that three-year-old child was too young to express desires), we do note that he bonded with Foster Parents and called them "Mommy and Daddy," *see In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio

22

2017, pet. denied) (noting that "[w]hen children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent" (quoting *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.))). Although the caseworker mentioned that J.P. expressed a desire to leave with Mother after visiting her, the caseworker also explained that he would be alright once he saw Foster Parents again, and Foster Mother testified that J.P. had not expressed a desire to live with Mother. *See In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.— Houston [14th Dist.] 2019, pet. denied) (explaining that child's love for parent is important consideration but does not override evidence of danger to child's safety); *see also In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.) (stating that "[t]he child's love of his parents cannot compensate for the lack of an opportunity to grow up in a normal and safe way equipped to live a normal, productive, and satisfying life").

Regarding J.P.'s emotional and physical needs, his basic needs include food, clothing, shelter, regular medical and dental care, and a safe and nurturing home. *See In re L.S.*, No. 02-16-00197-CV, 2016 WL 4699199, at *6 (Tex. App.—Fort Worth Sept. 8, 2016, no pet.) (mem. op.). Even though Mother testified that she was employed, would financially contribute to raising J.P., and would purchase clothes and food for J.P. if her rights were not terminated, no evidence was introduced regarding Mother's efforts to contribute while J.P. was living with Foster Parents. In contrast, the evidence at trial established that Foster Parents were able to meet J.P.'s emotional and physical needs, had a good relationship with him, and had the financial resources and flexibility to cover his future needs. Further, the evidence showed that J.P. had improved under the care of Foster Parents, had developed a more appropriate level of attachment, had made friends, and had established relationships with Foster Parents' extended

23

families. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *17 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (considering in best-interest analysis evidence of children's doing well in placement with foster parents, who met children's needs); *see also In re A.K.*, Nos. 07-17-00353—00354-CV, 2018 WL 912703, at *6 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.) (highlighting that courts may consider improvements by child following removal when assessing child's emotional and physical needs).

Although multiple witnesses testified that Mother loved J.P. and behaved appropriately during her visits with him and had completed most of her services, Mother did not address the Department's primary concerns about her mental health by failing to stay on her medications, causing her to experience delusions throughout the case when she was not consistently taking her medications. *See In re J.G.*, No. 02-20-00038-CV, 2020 WL 3410503, at *7 (Tex. App.—Fort Worth May 28, 2020, no pet.) (mem. op.) (explaining that "[t]he trial court was free to measure Father's potential future conduct in providing for the emotional and physical needs of the children based on Father's past conduct"); *In re J.M.T.*, 519 S.W.3d 258, 269-70 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (emphasizing in best-interest analysis that parent "failed to complete all of the tasks and services required in his service plan"); *see also In re A.J.D.-J.*, 667 S.W.3d 813, 824 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (observing that "when a parent does not try to abide by the plan, the factfinder may reasonably infer the parent is indifferent to the goal of family reunification"); *In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *9-10 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.) (noting that parent's completion of services without showing any benefit in behavior can support conclusion that parent's "willingness to access the programs and ability to follow through with them appear[s] questionable"). Further, the conservatorship specialist testified that Mother's

24

mental-health episodes would result in her remaining in her room for days and that Mother's inability to stabilize her mental health would inhibit her ability to parent J.P. Additionally, even though Mother testified that she could rely on her support system to help with J.P. when she needed it, the CASA testified that Mother did not have a support system in place. In contrast, Foster Mother stated that she and her husband were licensed foster parents. Foster Mother and Foster Father related that they enrolled J.P. in therapy to address his speech issues and that J.P. had made great strides under their care.

Concerning the plans for J.P., Mother testified that she would enroll him in school if she obtained custody and encourage him to participate in school activities of his choosing. Foster Mother explained that J.P. had already been attending a preschool and would attend a school near her house when he went to kindergarten. *See In re J.D.*, 436 S.W.3d at 119-20 (noting that "[t]he fact finder may compare the contrasting plans for a child . . . and consider whether the plans and expectations of each party are realistic or weak and ill-defined").

Turning to the stability of the home, Mother concedes in her brief that she did not have stable housing at the time of trial. Mother did testify at trial that she no longer lived with Boyfriend and that she had secured the weapons in the home. However, the CASA testified that there were still weapons out and available in the home, and evidence was presented indicating that Mother and Boyfriend had recently argued at the apartment. Foster Parents stated that they would provide a stable home for J.P. and that they wanted to adopt him. *See D.O. v. Texas Dep't of Hum. Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ) (observing that best-interest determination may consider whether termination would allow adoption to occur), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 & n.39 (Tex. 2002).

Even though multiple witnesses discussed believing that it was in J.P.'s best interest to have contact with Mother, all of the witnesses except Mother testified that it was in J.P.'s best interest to have Mother's rights terminated. *See In re S.P.* No. 02-18-00243-CV, 2018 WL 6565950, at *17 (Tex. App.—Fort Worth Dec. 13, 2018, pet. denied) (mem. op.) (noting "that the trial court could have rationally accepted the recommendations of the children's attorney ad litem, CASA workers, and the Department's representatives over the recommendations of Father's family and his former pastor"). Further, evidence was presented that terminating Mother's rights would provide J.P. with permanency, that the need for permanency outweighed any benefit from J.P.'s having a relationship with Mother, and that termination would allow Foster Parents to make unrestricted decisions regarding the family's best interest, and the trial court emphasized the importance of that type of autonomy when making its ruling. *See In re S.J.R.-Z.*, 537 S.W.3d at 695 (observing that "establishing a stable, permanent home for a child is a compelling interest of the government" (quoting *Dupree v. Texas Dep't of Protective & Reg. Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ))).

After weighing the disputed evidence that is contrary to the best-interest finding against the evidence supporting the best-interest finding, we conclude that the disputed evidence is not so significant that a reasonable factfinder could not have resolved it in favor of the finding. Accordingly, after considering the relevant factors under the appropriate standard of review, we conclude that the evidence is factually sufficient to support the trial court's finding that termination of the parent-child relationship was in J.P.'s best interest.

For these reasons, we overrule Mother's issue on appeal.

26

## CONCLUSION

Having overruled Mother's issue on appeal, we affirm the trial court's termination decree.

_____

Karin Crump, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed

Filed:   February 20, 2025